IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) FUTAMURA USA, Inc., Plaintiff, | ) | Civil Action No. 4:22-cv-00087-CVE-CDL |
| | ) | |
| v. | ) | |
| | ) | CLASS ACTION COMPLAINT |
| (2) SYMMETRY ENERGY SOLUTIONS, | ) | |
| LLC, Defendant | ) | DEMAND FOR JURY TRIAL |
| | ) | |
| | ) | |
| | ) | |

# TABLE OF CONTENTS

**Page**

I.    The Parties ..................................................................................................................3

II.   Jurisdiction and Venue.............................................................................................6

III.  Factual Allegations ...................................................................................................7

    A.    Winter Storm Uri .............................................................................................7

    B.    The Standard Form Contract..........................................................................11

        1.    Firm Delivery Obligations ....................................................................11

        2.    Pricing Terms ........................................................................................13

    C.    The Contractual Breach: Failure to Deliver..................................................17

    D.    The Contractual Breach: Improper Fees and Pricing Terms ................................22

    E.    Symmetry Concealed Their Fraudulent Billing through Omissions and Half-Truths, Lulling Customers into Relying on the Invoiced Statements. ..........24

    F.    Futamura's Good Faith Over-Payment..........................................................27

IV.   Class Allegations ....................................................................................................27

V.    Claims For Relief....................................................................................................30

    A.    Count I: Breach of Contract...........................................................................30

    B.    Count II: Good Faith and Fair Dealing ................................................................31

    C.    Count III: Unjust Enrichment and Disgorgement.................................................32

    D.    Count IV and V: Fraud and Deceit ................................................................33

    E.    Count VI: Constructive Fraud........................................................................37

    F.    Count VII: Declaratory Judgment..................................................................39

VI.   Jury Demand ...........................................................................................................40

**PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT**

Futamura USA, Inc. ("Plaintiff" or "Futamura"), on behalf of itself and the Class of all other persons similarly situated, files this Original Class Action Complaint against Symmetry Energy Solutions, LLC ("Symmetry" or "Defendant"), and alleges and states as follows:

**SUMMARY OF ACTION**

1.      Futamura operates a manufacturing facility that purchases natural gas from Symmetry.

2.      At the beginning of February 2021, Symmetry was well aware that a historic storm (a polar vortex) was approaching with anticipated freezing temperatures that would detrimentally affect its customers. Indeed, it had received actual and long-advanced notice from its suppliers that this storm would wreak havoc on the supply chain.

3.      Symmetry also knew exactly how much gas its customers had requested (nominated) for delivery in the month of February as well as the likelihood that there would be increased demand for gas with the historically low temperatures sweeping across the region.

4.      Despite this knowledge, Symmetry inadequately and catastrophically failed to plan to provide for Futamura and the Class. Instead, Symmetry chose to save its own business relationship with a *related* third-party whose subsidiary was Symmetry's predecessor-in-interest, diverting all of its gas supplies to serve that third-party at the height of the storm. In doing so, Symmetry failed Futamura and other customers in the Class by choosing not to deliver gas to them in material breach of their contracts for "firm delivery."

5.      This failure was not out of Symmetry's control; it was the direct result of Symmetry's reckless failure to properly and adequately plan. Indeed, throughout the period when

1

the region was gripped by a polar vortex, other gas marketers were able to deliver all of their retail customers' requested gas.

6.     When Symmetry failed to deliver gas to the delivery point for their customers (also known as the "city gate"), local distribution companies ("LDCs") such as Spire and Kansas Gas Service had to step in and provide gas to avoid disruptions of service. Yet, Symmetry never notified Futamura or the Class that much of the gas they received during the month had been delivered by the LDCs and not by Symmetry. Likewise, Symmetry never informed Futamura and the Class that, at the height of Winter Storm Uri, the baseload gas it had purchased on their behalf had been diverted to a third-party company with whom Symmetry had an undisclosed long-standing relationship.

7.     Even though Symmetry knew it had not delivered the gas it owed to its customers, it intentionally and fraudulently misled Futamura and the Class by suggesting it had fully delivered all of the gas its consumers used. Worse, it requested on invoices (and received) payment from Futamura and members of the Class for gas that it had never delivered to the customers it charged for this phantom gas.

8.     Symmetry not only charged customers for those days it did not deliver, but it also inappropriately used an incorrect index price and bundled in incremental supply costs that had not been contractually agreed to by its customers.

9.     In reliance on Symmetry's representation that it delivered the natural gas nominated and used during Winter Storm Uri, Futamura paid Symmetry what Futamura believed to be the reasonable and fair value for its natural gas usage during February 2021.

10.    But Futamura and the Class have now learned that Symmetry did not deliver all of the gas that it represented on their invoices.

11.     In the end, Symmetry breached its contract to provide firm delivery of gas to Futamura and the Class and is owed nothing further from Futamura and the Class. Instead, Futamura and the Class are due a refund from Symmetry for the amounts that Futamura and the Class paid in reliance on Symmetry's false representations of performance and for Symmetry's failure to perform.

## I.    THE PARTIES

12.     Futamura USA, Inc. is a Delaware limited liability company with a principal place of business in Atlanta, Georgia. Futamura is a global leader in manufacturing high-quality, specialized renewable and compostable packaging films and cellulose casings. Futamura's manufacturing operations are located in Tecumseh, Kansas.

13.     Symmetry Energy Solutions, LLC, is a Delaware limited liability company with its principal place of business in Houston, Texas. All of Symmetry's governing persons are located in Houston, Texas. Symmetry is a natural gas marketer that markets natural gas to businesses in Kansas, Missouri, Oklahoma, and other states. Symmetry may be served through its registered agent for service: The Corporation Company, 1833 S. Morgan Rd., Oklahoma City, OK 73128.

14.     Symmetry relies on the Southern Star interstate pipeline to transport gas from production areas to its market area in Kansas, Missouri, and Oklahoma.

15.     Southern Star is a large interstate pipeline system that transports gas from production areas to a market area in Kansas, Missouri, and Oklahoma.

16.     Symmetry is a retail natural gas marketer that markets natural gas and serves as an agent for end-user commercial customers.

17.     As a marketer of natural gas, Symmetry arranges purchases and sales of natural gas to satisfy its customers' natural gas needs.

18.     Symmetry purchases gas from suppliers and producers, and contracts for the transport and delivery of that gas with interstate pipelines and local distribution companies.

19.     Symmetry does not own physical assets commonly used in the supply of natural gas such as pipelines or storage facilities; Symmetry is wholly dependent on third parties for supply and transportation.

20.     Symmetry procures gas for all its customers behind the city gate of an LDC, contracts for the transportation of gas purchased from various suppliers, and then pools the gas together and arranges for its delivery to the city gate on its customers' behalf.

21.     Under the terms of Symmetry's agreements with LDCs, Symmetry acts as an agent on behalf of its customers located behind the city gate.

22.     A city gate is a term of art in the natural gas industry that is used to describe the point at which natural gas is transferred from an interstate or intrastate pipeline to a local natural gas utility, which may include an LDC.

23.     The natural gas system can be illustrated as follows:



24.     Symmetry has customers throughout the Midwest. Its customer base in Kansas and Western Missouri consists primarily of commercial, industrial, governmental customers including the Kansas City International Airport, and the Nelson-Atkins Museum of Art in Kansas City. It also serves critical infrastructure including at least 76 hospitals, 238 schools, three military bases, several school districts, multiple government customers, and numerous factories.

25.     In addition to marketing natural gas to end-user customers, Symmetry also wears another hat in the natural gas marketplace: it acts as an asset manager through Asset Management Agreements ("AMA").

26.     As an asset manager, Symmetry handles the supply and scheduling needs of a counterparty, such as a traditional utility. The AMA requires the asset manager to deliver gas to the purchaser when called upon to do so under the AMA. The asset manager also handles nominations of gas for its end user customers, by inputting these nominations on the utility's electronic bulletin board (known as an "EBB").

27.     The vast majority of the transportation and storage to which Symmetry has access to on the Southern Star pipeline is available to Symmetry pursuant to an AMA with Atmos Energy ("Atmos").

28.     Atmos has the ability under the AMA and FERC rules to fully utilize its assets (storage and transportation) at any time under certain circumstances to meet its delivery obligations. Exercising this right is known as a "call on assets."

29.     If Atmos needs to deliver gas that fully utilizes the contract gas quantity, during that period, Atmos has full rights to the assets. Symmetry, as the asset manager, cannot utilize those assets to serve other parties unless and until Atmos's daily supply requirements are fulfilled.

30. These assets were Atmos's to call on—not Symmetry's to use to serve their customers free and clear.

31. And it was well known and understood by those in the gas industry that gas shortages might happen. Thus, this zero-sum situation involving a gas shortage was well known as a risk the market faced.

32. If Symmetry as asset manager fails to comply with the terms of its AMA with Atmos, then Atmos as the asset owner has the right to recall its assets, which would essentially terminate the AMA.

33. Symmetry made a deliberate business decision not to secure their own storage contracts and storage supply as part of the service to their customers. They did this to cut corners, not incur the cost of holding and storing extra inventory, and increase profits.

34. The acts charged in this Complaint as having been done by Symmetry were authorized, ordered, or done by officers, agents, affiliates, employees, or representatives, while actively engaged in the conduct or management of Symmetry's business or affairs, and within the scope of their employment or agency with Symmetry.

## II. JURISDICTION AND VENUE

35. This Court has original, subject-matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d)(2)(A) because at least one member of the class of plaintiffs is a citizen of a State different than Symmetry and the amount in controversy exceeds the sum or value of $5,000,000.

36. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because many of the acts and transactions giving rise to this action occurred in this District, Defendant conducts substantial business in this District, Defendant intentionally availed itself of the laws, protections,

and markets of this District, and Defendant is subject to personal jurisdiction in this District. Additionally, under a mandatory forum-selection clause, the parties agreed that the venue for any action would be federal or state court in Tulsa County, Oklahoma.

## III.   FACTUAL ALLEGATIONS

### A.   Winter Storm Uri

37.    In February 2021, as reported in the local and national media, Winter Storm Uri brought multiple days of sustained snow, ice, and freezing temperatures across the Midwest, including in Kansas, Oklahoma, and Missouri.

38.    As early as the first of February, Symmetry was aware that its upstream suppliers, producers, and transporters were being affected and that its supply could be impacted.

39.    Symmetry began planning for declining temperatures in early February.

40.    On February 2, 2021, Southern Star interstate pipeline issued a Winter Weather Watch effective February 6.

41.    On February 8, 2021, Southern Star issued an Operational Flow Order ("OFO") effective February 11. An OFO is a mechanism used to preserve the integrity of a pipeline or distribution system by requiring customers on those systems to meet certain requirements, such as ensuring that deliveries and receipts are balanced to avoid an over-pressure or under-pressure situation.

42.    Symmetry was aware that when temperatures decline, demand for natural gas increases because customers use increased gas to burn as a heating source and as a source for natural-gas-driven electric plants.

43.    Without stored inventory, as Symmetry has acknowledged, it is also aware that it is subject to the market's inherent laws of supply and demand, including the possibility of cuts and

the inability to purchase depending on the market for natural gas supply from upstream suppliers such as pipelines and natural gas producers.

44.     Extreme weather has been routine in recent years, and those in the gas industry who study and focus on the weather, severe winter storms were especially foreseeable.

45.     Despite this awareness by Symmetry and those in the gas industry, during an approximately ten-day period, Symmetry has admitted in sworn testimony from its Vice President of Gas Supply, Scheduling, and Asset Management (Mr. William Lee) that Symmetry could not obtain enough natural gas to deliver to its customers served by the Southern Star pipeline from either its baseline purchases, Atmos' storage gas, or spot purchases. Symmetry also had poor credit, which further hampered its ability to purchase gas on the spot market during Winter Storm Uri.

46.     As to ***baseload gas***, Symmetry had purchased a certain amount of its customers' required gas for February 2021 by the beginning of the month. However, Symmetry had not obtained firm contracts with its suppliers.

47.     Starting on February 8, Symmetry's suppliers of baseload gas supply started to cut gas deliveries. A supply "cut" simply means that gas that was scheduled to arrive did not arrive. Symmetry receives reports for cuts and can take further action if necessary. Because Symmetry had not contracted for firm delivery from its suppliers, when a delivery is cut, that delivery simply is not invoiced or paid for.

48.     Starting on February 11, Symmetry's suppliers also provided Symmetry with force majeure notices. A force majeure notice in this context is a formal notice that a supplier will not be able to deliver gas during a particular period and in a particular area.

49.    On certain days during Winter Storm Uri, the majority of Symmetry's baseload gas supply was cut or subject to force majeure notices.

50.    Symmetry's largest source of gas on Southern Star issued a force majeure notice notifying Symmetry that it would not be able to deliver contracted quantities of gas at the Southern Star production-market interface (or PMI).

51.    Symmetry had gas cut by its suppliers from February 8 through February 22, 2021.

52.    Because of these cuts, Symmetry needed to purchase additional gas on the ***spot market***.

53.    Symmetry also knew that it was already going to need to buy spot or swing gas to serve its customers on the Southern Star pipeline during the month of February 2021 because its baseload gas would not cover all of the required gas.

54.    Symmetry was also aware that natural gas suppliers would give preference to spot purchasers with less credit risk because as a seller in a spot transaction they are providing gas immediately or near immediately while invoicing and collecting funds later. Symmetry also knew that spot sellers preferred selling to regulated utilities rather than marketers. Finally, Symmetry knew that it had credit issues that made it more of a credit risk in spot transactions.

55.    As the storm wore on and prices increased, multiple suppliers were not willing to increase Symmetry's existing credit lines to allow Symmetry to purchase additional supply at the prevailing high prices.

56.    Symmetry did not purchase enough gas on the spot market in the relevant area to cover the amount nominated and required by its customers, much less the excess demand created by the extremely low temperatures. Symmetry did not replace on the spot market the baseload gas supplies that Symmetry's suppliers had cut.

9

57.     Instead, Symmetry made the business decision to avoid the high daily index prices for natural gas and either rely on stored gas or simply not deliver gas. This was not a risk that Futamura and the Class signed up for or agreed to, nor did Symmetry consult with anyone before it unilaterally chose to put its own interests above anyone else's. Notably, Futamura and the Class have contracts with Symmetry which require "firm delivery" of natural gas.

58.     It was especially reckless for Symmetry to rely on ***storage gas***. Symmetry was aware that it did not have its own stored gas and the vast majority of the storage gas that it relied on as a last resort on Southern Star was not owned free and clear; it was subject to contractual obligations under the AMA with Atmos.

59.     And starting February 15, Atmos demanded Symmetry deliver all gas that Symmetry had to Atmos up to Atmos's daily forecasted usage. This required Symmetry to direct all of Atmos's available gas to Atmos's customers, and there was no excess capacity for Symmetry to use for its customers.

60.     In practical terms, this meant that Symmetry could no longer use the gas in storage to which it had access on Southern Star to serve any utilities other than Atmos, and essentially all gas Symmetry could obtain for delivery on Southern Star had to be delivered to Atmos.

61.     To meet this demand, Symmetry had to deliver essentially all of its then-available supply on Southern Star to Atmos from February 16 through 18.

62.     On the other days from February 12 through 22, Symmetry was still unable to fully deliver all the gas requested by its customers. Symmetry has yet to fully disclose publicly the extent of its underdeliveries; it has largely redacted this type of information in filings to the Missouri Public Service Commission and the Kansas Corporation Commission.

63.     There are storage facilities developed for purely commercial storage operations with capacity available for marketers who may purchase gas for storage in low demand periods and deliver gas out of storage to meet peak needs during periods of high demand (in other words, to buy low and avoid having to purchase supplies at peak market rates). Symmetry could have contracted to obtain storage capacity like other gas marketers do. Symmetry, however, chose not to because it wanted to maximize profits, even if that meant its customers would suffer.

64.     These many failures were the result of risky and selfish business decisions made by Symmetry to not incur the high costs to purchase sufficient base or spot gas and not to hold any firm capacity to serve their customers that wasn't obligated to a business partner through an AMA.

### B.     The Standard Form Contract

### 1.     Firm Delivery Obligations

65.     Futamura purchases natural gas solely from Symmetry. That relationship, like those of all Class Members, is governed by a Base Contract for Sale and Purchase of Natural Gas.

66.     Futamura and Symmetry entered into this Contract on February 4, 2010,[1] and confirmed on May 13, 2014.[2]

67.     The standard form natural gas sales agreement provides that Symmetry will deliver natural gas to the existing delivery points or interconnects between the Southern Star Pipeline and the customer, here Futamura (previously known as Innovia Films).[3]

---

[1] Ex. 1 (Feb. 4, 2010 Agreement).

[2] Ex. 2 (Exhibit "A" confirmation dated 5/13/14, General Terms and Conditions ¶ 5).

[3] Ex. 1 (Feb. 4, 2010 Agreement).

68.     Under the standard contract, it was Symmetry's obligation to "arrange for transportation to the delivery point"[4] of natural gas of "pipeline quality."[5]

69.     Symmetry agreed to deliver "100% of Buyer's natural gas requirements."[6]

70.     Symmetry agreed to use its "best efforts to ensure that the quantity" it "dispatched" "is delivered."[7]

71.     In its transaction confirmations, Symmetry confirms that its "performance obligation" is "firm" and that it is obligated to deliver to the "Utility Citygate – S Star."[8] "S Star" refers to Southern Star.

72.     Futamura and the Class seek firm delivery commitments as part of the contract with marketers to ensure they can provide critical services, avoid costly manufacturing interruptions, and avoid charges or penalties from LDCs.

73.     Under the standard agreement, Symmetry requires customers to nominate the amount of natural gas that they will use before the start of the month. For example, Futamura provided its monthly nominations for July 2020 through October 2022 in February of 2020.[9] Any change of monthly nominations had to be provided to Symmetry at least seven business days

---

[4] Ex. 1 (Feb. 4, 2010 Agreement, General Terms and Conditions ¶ 5); Ex. 2 (Exhibit "A" confirmation dated 5/13/14, General Terms and Conditions ¶ 5).

[5] Ex. 1 (Feb. 4, 2010 Agreement, General Terms and Conditions ¶ 4); Ex. 2 (Exhibit "A" confirmation dated 5/13/14, General Terms and Conditions ¶ 4).

[6] Ex. 1 (Feb. 4, 2010 Agreement).

[7] Ex. 1 (Feb. 4, 2010 Agreement, General Terms and Conditions ¶ 3); Ex. 2 (Exhibit "A" confirmation dated 5/13/14, General Terms and Conditions ¶ 3).

[8] Ex. 3 (2/10/20 Transaction Confirmation); Ex. 4 (2/21/20 Transaction Confirmation); Ex. 5 (11/6/20 Transaction Confirmation).

[9] Ex. 3 (2/10/20 Transaction Confirmation).

before the start of monthly delivery.[10] Because Symmetry requires its customers to provide definite estimates of their monthly and daily use, Symmetry knew well before the start of monthly deliveries in February 2021 how much natural gas required firm delivery to its customers during that month.

74.     Symmetry was responsible for the gas up to the Point of Delivery and warranted that it had "title to gas" and that it was "free and clear of all liens and encumbrances."[11]

75.     Symmetry agreed to indemnify and hold harmless its customers from all damages, loss, cost, or expense arising from its own acts or conduct.[12]

76.     The standard contract signed by the parties provided for limited force majeure. In the contract, force majeure was defined as "acts of God, strikes, lockouts or other industrial disturbances including those involving or affecting parties producing or transporting gas for Seller."[13]

77.     In short, Symmetry is obligated to sell and deliver natural gas in the nominated quantity and appropriate quality to customers. As set forth below, Symmetry did none of these things during critical periods of Winter Storm Uri, yet it invoiced its customers as if it did.

### 2.     Pricing Terms

78.     The Natural Gas Agreement provides very specific agreements on the pricing for delivered natural gas:

---

[10] Ex. 3 (2/10/20 Transaction Confirmation).

[11] Ex. 1 (Feb. 4, 2010 Agreement, General Terms and Conditions ¶ 11); Ex. 2 (Exhibit "A" confirmation dated 5/13/14, General Terms and Conditions ¶ 11).

[12] Ex. 1 (Feb. 4, 2010 Agreement, General Terms and Conditions ¶ 11); Ex. 2 (Exhibit "A" confirmation dated 5/13/14, General Terms and Conditions ¶ 11).

[13] Ex. 1 (Feb. 4, 2010 Agreement, General Terms and Conditions ¶ 12); Ex. 2 (Exhibit "A" confirmation dated 5/13/14, General Terms and Conditions ¶ 12).

(a)     Every month a customer must nominate the monthly quantity of gas to be purchased and sold. For the nominated volumes, the parties agreed that the volume would be equally allocated to each day of the month. For the nominated volumes, the parties agreed that the contract price would be "Platts Gas Daily Price Guide, Midpoint Averages, 'Oklahoma, Southern Star' plus $0.24/MMBtu."[14]

(b)     If the Buyer consumes more gas than the nominated amount on any day, Buyer pays for the additional volumes at a price equal to the Platts Gas Daily Price Guide, Midpoint Averages plus $0.31/MMBtu for the winter months (November thru March).

(c)     If the Buyer takes less gas than the nominated amount on any day, Symmetry was required to credit the Buyer for the unused volumes at a price equal to the Platts Gas Daily Price Guide, Midpoint Averages plus $0.00/MMBtu.

(d)     The parties agreed that the monthly index price would be determined by "the price of spot gas delivered to [the applicable pipeline and region] for the first of each applicable delivery month." The parties had originally agreed to look to the "Inside FERC's Gas Market Report" for that price.[15] While the parties had in subsequent transaction confirmations changed the source of price information to Platts Gas Daily Price Guide,[16] the parties never changed the definition that the controlling monthly price was that of "the price of spot gas delivered to [the applicable pipeline and region] for the first of each applicable delivery month."

(e)     A customer can convert a specific quantity up to the nominated monthly volume to a fixed price. While the Transaction Confirmation specifies that nominated volume is

---

[14] Ex. 3 (2/10/20 Transaction Confirmation).

[15] Ex. 2 (Exhibit "A" confirmation dated 5/13/14, General Terms and Conditions ¶ 1).

[16] *See* Ex. 3 (2/10/20 Transaction Confirmation).

14

equally allocated to each day of the month, no such provision covers converted Fixed Price volumes. Rather a customer uses its Fixed Price volumes first and then can either purchase additional Fixed Price volumes or return to the Midpoint Averages for the remainder of the days. This interpretation is confirmed by Symmetry's practice of allowing customers to purchase additional Fixed Price volumes at any time in the month as the customer monitors usage.

79.     Every day Platts Gas Daily provides a final daily price survey for its locations across the country, including Southern Star. The Final Daily Price Survey shows the Midpoint average for each location in $/MMBtu.

## FINAL DAILY PRICE SURVEY - PLATTS LOCATIONS ($/MMBtu)

NATIONAL AVERAGE PRICE: 2.400
Trade date:   02-Apr
Flow date(s): 03-Apr

Powered by ICE

| | | Midpoint | +/- | Absolute | Common | Vol. | Deals |
|---|---|---|---|---|---|---|---|
| **Northeast** | | | | | | | |
| Algonquin, city-gates | IGBEE21 | 2.685 | -0.175 | 2.660-3.000 | 2.660-2.770 | 309 | 53 |
| | | | | | | | |
| **Midcontinent** | | | | | | | |
| ANR, Okla. | IGBBY21 | 2.395 | -0.080 | 2.340-2.460 | 2.365-2.425 | 189 | 47 |
| Enable Gas, East | IGBCA21 | 2.465 | -0.060 | 2.400-2.540 | 2.430-2.500 | 64 | 16 |
| NGPL, Amarillo receipt | IGBDR21 | 2.500 | -0.050 | 2.480-2.510 | 2.495-2.510 | 183 | 34 |
| NGPL, Midcontinent | IGBBZ21 | 2.475 | -0.015 | 2.400-2.510 | 2.450-2.505 | 963 | 136 |
| Oneok, Okla. | IGBCD21 | 1.655 | +0.220 | 1.600-1.700 | 1.630-1.680 | 224 | 38 |
| Panhandle, Tx.-Okla. | IGBCE21 | 2.200 | -0.090 | 2.050-2.300 | 2.140-2.265 | 455 | 100 |
| Southern Star | IGBCF21 | 2.130 | -0.065 | 1.950-2.450 | 1.980-2.280 | 80 | 12 |
| Tx. Eastern, M-1 24-in. | IGBET21 | 2.590 | -0.035 | 2.570-2.600 | 2.585-2.600 | 2 | 3 |
| **Midcontinent regional average** | IGEAA00 | 2.300 | | | | | |

80.     Platts Gas Daily is a subscription service so customers cannot verify what price Symmetry should be charging without incurring substantial additional expense. Futamura and the Class relied on Symmetry to provide accurate pricing terms on their monthly invoices.

15

81.     In its standard agreement, Symmetry further provided that "during the term of any period of daily balancing, operational flow order, critical notice or other like circumstance declared by any Transporter for any transaction, Seller will use commercially reasonable efforts to secure additional reasonable quantities or sell excess reasonable quantities of Gas requested by Transporter, and all such additional or excess quantities purchased or sold by Buyer in excess or short of the Contract Quantity will be billed or credited to Buyer as the first quantities through the meter that Day at a cost equal to the prices of Gas available to Seller at such time, as reasonably determined by Seller."[17] If Symmetry had performed as obligated, Symmetry would have had access to an adequate supply of natural gas at all times and at a reasonable price so that Futamura and the Class would not be subject to inflated gas prices.

82.     Under the parties' agreement, customers agree to pay a set negotiated price for the purchase, transportation, and delivery. Nowhere in the contract is Symmetry authorized to pass on transporter penalties or additional costs to customers.

83.     As detailed below, beyond charging Futamura and the Class for volumes not delivered, Symmetry violated almost every single pricing term. It did not respect customer nominations. It charged a monthly average of the daily index price, rather than the agreed upon spot price from the first of the month. It spread Fixed Price gas across the entire month instead of allowing customers to consumer that natural gas first. And it failed to make commercially reasonable efforts to secure natural gas prior to and during Winter Storm Uri and pass along the "cost equal to the price of Gas" available to Symmetry at that time.

---

[17] Ex. 3 (2/10/20 Transaction Confirmation); *see also* Ex. 1 (Feb. 4, 2010 Agreement, General Terms and Conditions ¶ 7); Ex. 2 (Exhibit "A" confirmation dated 5/13/14, General Terms and Conditions ¶ 7).

## C.     The Contractual Breach: Failure to Deliver

84.     Despite being on notice of severe strains in the supply chain and transporter penalties, Symmetry failed to make the necessary arrangements to provide firm delivery of gas to its customers served by the Southern Star pipeline for at least ten days, from February 12 through 22, 2021.

85.     According to Symmetry's testimony before the Missouri Public Service Commission and the Kansas Corporation Commission, on or around February 12, 2021, Symmetry could no longer meet the "firm" delivery obligations to all of its customers. Thus, Symmetry failed to deliver all of its customers' nominated amounts from at least February 12 to February 22.

86.     Through daily nominations, Symmetry told LDCs how much gas Symmetry would be transporting daily to the city gate to be delivered in nominated amounts to their customers behind the city gate. On information and belief, Symmetry began nominating daily amounts lower than those contracted for by Futamura and the Class between February 12 and February 22.

87.     Despite failing to deliver the gas nominated under the contract, Symmetry charged Futamura and the Class for gas it did not deliver.

88.     When Symmetry failed to deliver the contracted-for natural gas, LDCs, like Kansas Gas Service and Spire, stepped in and delivered gas to Futamura and the Class to avoid interruption in service. Unless Symmetry informed Futamura and the Class that they were not the ones to deliver the gas, customers had no way of knowing who delivered the gas they used.

89.     Because Symmetry did not deliver nominated gas to Futamura and the Class, Symmetry was able to use its baseload, storage, and spot gas to meet obligations to Atmos under the AMA and to other customers. In other words, Symmetry was able to sell the gas to other entities but continued to charge Futamura and the Class for gas it never even delivered.

90.     Under the contract, Symmetry was required to compensate Futamura and the Class for gas they had requested (nominated) but that Symmetry did not end up delivering. Symmetry gave no such credit either on a daily or monthly balancing.

91.     For example, on information and belief, Symmetry only delivered 57,245MMBtu to Futamura, but it charged Futamura for 73,919MMBtu (all the gas used by Futamura in the month including gas delivered by an LDC). While Futamura and the Class disagree that Symmetry's monthly balancing with a monthly average index approach is appropriate under the contract, even that same method demonstrates the astronomical overbilling as highlighted below:

| | Symmetry's Billed Invoice | Billing Only for Delivered Gas |
|---|---|---|
| **NATURAL GAS SALES FIXED** (Futamura pre-purchased 28,280MMBtu at a fixed price of $2.23) | 28,280MMBtu * $2.23= **$63,064.29** | 28,280MMBtu * $2.23= **$63,064.29** |
| **NATURAL GAS SALES FIXED** (Futamura pre-purchased 17,700MMBtu at a fixed price of $3.08) | 17,700MMBtu * $3.08= **$54,516.00** | 17,700MMBtu * $3.08= **$54,516.00** |
| **NATURAL GAS SALES** remainder of nominated gas delivered * (mean of Gas Daily midpoint average for entire month + $0.24 adder) | (70,700MMBtu-28,280MMBtu-17,700MMBtu)*($75.31+$0.24)= 24,720MMBtu * $75.55= **$1,867,596** | (57,245MMBtu-28,280MMBtu-17,700MMBtu)*($75.31+$0.24)= 11,265MMBtu * $75.55= **$851,070.75** |
| **NATURAL GAS SALES OVERTAKE** gas used over nomination * (mean of Gas Daily midpoint average for entire month + $0.24 adder) | (73,919MMBtu-70,700MMBtu)* ($75.31+$0.31)= 3,219MMBtu * $75.62= **$243,420.78** | N/A |
| **NATURAL GAS SALES UNDERTAKE** Credit for volume not delivered that was requested (Difference between gas nominated and gas delivered, if less than nominated amount) * mean of Gas Daily midpoint average for entire month | N/A | (70,700MMBtu-57,245 MMBtu)*$75.31= 13,455MMBtu*$75.31= **($1,013,296.05)** |
| **TOTAL** | **$2,228,597.07** | **($44,645.01)** |

92.     If Futamura and the Class were properly compensated with the market rates during the OFO and charged under the first-of-the-month daily midpoint average for the index sales, Symmetry would owe Futamura an even greater refund and the Class would likewise owe even less to Symmetry.

93.     While it may seem counter-intuitive that Symmetry would have to compensate Futamura when Futamura used gas during the month of February 2021, the balance recognizes two factors that the parties had contemplated in the contractual terms. *First*, because Symmetry was able to use gas nominated by Futamura and the Class to meet demands under its AMA with Atmos, Symmetry did not need to purchase high priced gas on the spot market to meet the Atmos demand. Futamura and the Class should be compensated for involuntarily giving up their requested gas to financially benefit Symmetry. *Second*, Futamura and the Class are still subject to liens and potential penalties from the LDCs, such as Kansas Gas Service and Spire, for the gas that those companies had to deliver to meet the Class's demand when Symmetry was unable to meet its firm delivery obligations.

94.     Symmetry is a sophisticated company that made the decision, in its own interest, to enter into a contract where the price it receives for purchase, transport, and delivery is set by fixed agreement or market indices. Given the long-term contracts for specific volumes, Symmetry can make calculated decisions on its upstream purchases for its customers. But with that benefit comes the possibility, accepted by Symmetry, that it may have to procure and transport natural gas at times when the penalties and supply are curtailed. Symmetry's decision to simply forego its contractual obligation to deliver and then pass on non-contractual expenses is unconscionable.

Symmetry wants all of the upside of high index prices, but with none of the downside of actually having to purchase or transport the natural gas.

95.     Far from the required "commercially reasonable efforts" contractually required for exigencies such as OFOs, Symmetry instead overpromised its "firm" obligations to deliver natural gas uninterrupted with free and clear title to numerous customers including Futamura and the Class.

96.     Symmetry could only declare a force majeure due to an "act of God" under the form contract. But the problems here were not an act of God, but rather were caused by an act or, more accurately, a failure to act by Symmetry. Symmetry had multiple options to avoid its predicament:

(a)     Get Firm Contracts with limited force majeure from its suppliers so Symmetry's upstream contracts matched the ones with its downstream customers;

(b)     Contract with a commercial storage facility to store its own gas or contract with someone who did for free and clear title to storage gas;

(c)      Contract so it does not have to prioritize Atmos's customer;

(d)     Buy interruptible gas in sufficient volume that it can lay off volumes when no shortage and cover when there is a shortage;

(e)     Provide contractual incentives for its customers not to use the usual daily nomination (pay for non-use to free up more capacity);

(f)     Obtain better credit or contract with someone who does to be able to buy on the spot market quickly and easily.

97.     Even if Symmetry could declare a force majeure event for long-predicted weather events, its notice only stated that it may not be able to make its delivery obligations. Nothing in the contract or the notice allows Symmetry to bill customers for natural gas that it did not deliver.

### D.     The Contractual Breach: Improper Fees and Pricing Terms

98.     Under the contract, the monthly index price is defined as "the price of spot gas delivered to [the applicable pipeline and region] for the first of each applicable delivery month."[18] But Symmetry charged Futamura the mean of all the daily midpoint averages for the entire month. The Platts Gas Daily Midpoint Average for the first of February 2021 was $2.55/MMBtu. But Symmetry charged Futamura $75.31/MMBtu. While customers would not have noticed a difference in most months, in February 2021, Symmetry could no longer conceal the improper pricing.

99.     Under the contract, customers could nominate to take a certain volume up to the total nominated for the month at a fixed price. Rather than have the fixed volume run first until exhausted, Symmetry equally distributed the fixed priced gas on every day of the month. But the contract only provides for this equal allocation to each day for the monthly volume commitment. Because the contract did not specify how to allocate the fixed volumes, the commonsense understanding would be that these volumes would be used first until exhausted. This is also consistent with Symmetry's practice of allowing customers to make additional or initial fixed purchases starting in the middle of the month.

100.    Under the contract, Symmetry can only charge an additional $0.31/MMBtu on top of the Platts Gas Daily Price Guide, Midpoint Averages for gas used in excess of nominated amounts. But Symmetry charged Futamura more than $1.60/MMBtu on top of its chosen index price for excess gas.

---

[18] Ex. 2 (Exhibit "A" confirmation dated 5/13/14, General Terms and Conditions ¶ 1).

101.     Symmetry also attempted to charge Futamura and the Class for "Incremental Supply Cost." On Futamura's original invoice dated March 17, 2021, this amounted to a charge of $2,997,412.06.[19] After Futamura requested a detailed invoice, Symmetry revised this incremental supply cost to $859,086.64.[20]

102.     Finally on June 6, 2021, Symmetry completely removed the incremental supply cost through a "ISC Free Credit Adjustment" and in the cover letter stated that the revised invoice is "billed exactly per your contract."[21] As Symmetry implicitly has conceded, any incremental supply cost charge passed on to its customers were not authorized under the contract and should be refunded or declared invalid.

103.     Finally, during any period of daily balancing such as an OFO, Symmetry cannot charge the Platts Gas Daily Midpoint Average for any excess quantities delivered to customers during those periods. Rather, it is limited to charging "a cost equal to the prices of Gas available to Seller at such time, as reasonably determined by Seller," that it was able to procure using "commercially reasonable efforts." While Platts Gas Daily Midpoint Average may have been higher at the height of Winter Storm Uri, Symmetry was able to purchase stored gas for prices well below the Platts Gas Daily Midpoint Average on those days. Additionally, even those efforts were not commercially reasonable, because Symmetry has admitted that they did not impose any budgetary or other limitations on what spot gas its traders could buy. Futamura and the Class should not be forced to bear these costs that have no reasonable commercial basis simply because

---

[19] Ex. 9, Symmetry Invoice to Futamura for Natural Gas Deliveries (3/17/2021).

[20] Ex. 10, Symmetry Updated Invoice to Futamura for Natural Gas Deliveries (4/6/2021).

[21] Ex. 11, Symmetry Revised Invoice and Cover Letter (6/9/2021).

Symmetry had put itself in a position where it was desperately trying to cover its over-commitments.

> **E.      Symmetry Concealed Their Fraudulent Billing through Omissions and Half-Truths, Lulling Customers into Relying on the Invoiced Statements.**

104.    Symmetry sent "template messages" to its end-user customers about Winter Storm, its response, and the impact on end-use customers. But these messages inappropriately deflected, threatened, and concealed key information.

105.    In one such "template message," Symmetry informed its "valued" customers that they could be subject to substantial penalties or overtake charges. Nothing in the form contracts allowed Symmetry to pass on penalties it incurred for its failure to nominate or deliver gas for its customers. Futamura employee Darcy Koch received this template message from Symmetry Communications on February 12, 2021.

106.    Symmetry sales representatives had told Futamura and Class customers that they would be fine as long as they kept their gas usage within the monthly nominated amounts. But this fraudulently concealed that Symmetry had not actually made those nominations for firm delivery to the local distribution companies on behalf of Futamura and the Class.

107.    On or about February 19, 2021 (a full week after the purported force majeure event started), Symmetry sent an email to Futamura and other members of the Class noting that a force majeure event would result in suspension of full or partial deliveries starting on February 12, 2021:[22]

> This letter serves as written notification of a Force Majeure event beginning no later than February 12, 2021, and continuing until further notice, due to the failure of gas supply caused by extremely low temperatures that have caused freezing or failure

---

[22] Ex. 6, Email from Symmetry Communications (2/19/2021).

of wells or lines of pipe affecting the entire geographic region, including but not limited to market areas served by Southern Star Central Gas Pipeline, Inc. These events have caused Symmetry Energy Solutions' (Symmetry) supply to be cut, and this Force Majeure event will result in the suspension of either full or partial deliveries under the base contract until further notice. Although these weather conditions and the consequential supply cut are not reasonably within Symmetry's control, we are working to expeditiously resolve this issue and will continue to provide you with periodic updates.

Symmetry did not end its declared force majeure suspension of deliveries until February 22, 2021.[23] Futamura employee Darcy Koch received this notice, signed by Symmetry VP of Sales Brian Harrison, on February 19, 2021.

108.    But, contrary to the notice, there was no "failure of gas supply"; rather, gas was still available.

109.    Additionally, the standard form contract limited force majeure to "as "acts of God, strikes, lockouts or other industrial disturbances." Cuts by Symmetry's gas suppliers are hardly acts of God; rather, it is an act of a gas supplier that Symmetry knew was possible and that Symmetry could and should have been prepared for.

110.    By issuing its misleading "Force Majeure" notice on February 15, 2021, Symmetry fraudulently represented to Futamura and others that it could not deliver natural gas in the Southern Star market. On the same date that it issued the fraudulent "Force Majeure" notice, Symmetry had made a business decision to divert all of its available natural gas supply on Southern Star to its business partner, Atmos. At no time did Symmetry inform Futamura or the Class that Atmos had called all assets under the AMA.

111.    On March 15, 2021, Symmetry sent its customers a form letter with "additional information regarding your invoice(s) for the February billing cycle." Symmetry told customers

_____

[23] Ex. 7, Email from Symmetry Communications (2/26/2021).

that it had incurred higher prices for their supply: "Due to the lack of physical natural gas supply and restrictions on natural gas transportation, natural gas prices *incurred for your supply* were considerably higher than normal during this period. Those higher natural gas costs will be reflected on your February invoice, which may also include certain charges imposed by pipeline companies and local distribution companies (LDCs) in February." Symmetry concealed the basis for the charges—*Symmetry's* failure to deliver the nominated gas—and materially misrepresented that they had incurred high prices for customers' natural gas supply while concealing that they had not been able to procure the gas at all.[24] Futamura employees Tim Koch and Darcy Koch received this notice from Symmetry Communications on March 15, 2021 by email, and again on April 6, 2021.

112.    In the same letter dated March 15, 2021, Symmetry misleadingly stated that it had "worked tirelessly to secure replacement gas wherever possible to keep natural gas flowing and meet the needs of our customers in real-time." Symmetry omitted that they were unable to secure that replacement gas, they had not kept the gas flowing, did not meet the needs of their customers in real-time, and forced LDCs to step in to meet real-time needs.[25]

113.    Finally, the March 15, 2021, letter misleadingly stated that "Symmetry will be paying its suppliers in March for the natural gas it *purchased for and distributed to our customers* in February."[26] Symmetry omitted that it did not actually purchase or distribute all of the natural gas its customers had nominated or used during February 2021.

---

[24] Ex. 8, Letter from The Symmetry Team (3/15/2021).

[25] Ex. 8, Letter from The Symmetry Team (3/15/2021).

[26] Ex. 8, Letter from The Symmetry Team (3/15/2021).

114.    Symmetry fraudulently concealed and omitted the real reasons for its inability to meet its delivery obligations: its decision to overextend itself with too many firm commitments and then divert all of its available natural gas supply to its business partner, Atmos.

115.    Symmetry then sent Futamura and all Class members "Invoices for Natural Gas Deliveries" that set out the "Volume" for the "Delivery Period" as well as the commodity charges for "Current Delivery" for "February 2021." Symmetry fraudulently listed volumes here that were not actually delivered during the month. Futamura's invoice was dated March 17, 2021.[27]

116.    Symmetry sent Futamura updated invoices on April 6, 2021, and June 9, 2021.[28] These invoices still conceal the critical information and include fraudulent misrepresentations, omissions, and half-truths.

### F.    Futamura's Good Faith Over-Payment

117.    Futamura made a good faith payment of $248,109.61 in May 2021 based on the representations that Symmetry had delivered all of the gas it used in the month of February 2021.

118.    This payment is greater than Futamura owed under the contractual terms given the non-delivery of gas during critical periods.

## IV.    CLASS ALLEGATIONS

119.    Plaintiff Futamura brings this action on behalf of itself and as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "Class"):

> All customers who contracted with Symmetry for the firm delivery of natural gas on the Southern Star pipeline in the States of Kansas, Missouri, and Oklahoma during February 2021 and who Symmetry (1) failed to deliver all of the natural gas

---

[27] Ex. 9, Symmetry Invoice for Natural Gas Deliveries (3/17/2021).

[28] *See* Exs. 10 and 11.

Symmetry charged for; (2) included an Incremental Supply Cost charge; and/or (3) failed to use the contracted-for price terms.

Excluded from the Class are: (1) agencies, departments, or instrumentalities of the United States of America, including but not limited to the U.S. Department of Interior (the United States, Indian tribes, and Indian allottees); (2) the State of Kansas, Missouri, or Oklahoma or any of their agencies or departments; (3) Symmetry, its affiliates, predecessors, and officers, and directors; and (4) Symmetry's customers who have delivery at the Atmos city gate.

120.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.

121.    There are hundreds in the putative Class. Symmetry has over 300 customers on Southern Star behind the Spire city gate and hundreds of customers in Kansas behind non-Atmos city gates.

122.    Symmetry has within its possession or control records that identify all customers to whom it (including affiliated predecessors and those for whom it is legally responsible) contracted with for the delivery of natural gas during February 2021.

123.    The questions of fact or law common to Plaintiff and the Class include, without limitation, one or more of the following:

(a)      Whether the contractual provision for firm delivery required Symmetry to deliver nominated gas on a daily basis?

(b)      Whether Symmetry's failure to deliver the nominated gas was a breach of contract?

(c)      Whether Symmetry's invoicing for undelivered gas was a breach of contract?

(d)      Whether Symmetry's invoicing for Incremental Supply Cost charges was authorized under the contract?

(e)     Whether Symmetry's representation on invoices that it was charging for delivered gas was fraudulent?

(f)     Can class-wide damages be calculated for Plaintiff's theories of liability?

124.    Plaintiff is typical of other Class members because Symmetry invoices customers using a common method, contracts with customers using form contracts, and communicates with customers through template messages.

125.    Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is a Symmetry customer to whom Symmetry sent an inflated bill for deliveries in February 2021. Plaintiff understands its duties as a Class representative. Plaintiff has retained competent counsel who are experienced in class action and natural gas litigation.

126.    This action is properly maintainable as a class action. Common questions of law or fact exist as to all members of the Class, and those common questions predominate over any questions solely affecting individual members of such Class. There is no need for individual Class members to testify in order to establish Symmetry's liability to or damages sustained by Plaintiff and members of the Class.

127.    Class action treatment is appropriate in this matter and is superior to the alternative of numerous individual lawsuits by members of the Class. Class action treatment will allow a large number of similarly situated individuals to prosecute their common claims in a single forum, simultaneously, efficiently, and without duplication of time, expense and effort on the part of those individuals, witnesses, the courts, and/or Symmetry. Likewise, class action treatment will avoid the possibility of inconsistent and/or varying results in this matter arising out of the same facts. No difficulties are likely to be encountered in the management of this class action that would preclude

its maintenance as a class action and no superior alternative forum exists for the fair and efficient adjudication of the claims of all Class members.

128.    Class action treatment in this matter is further superior to the alternative of numerous individual lawsuits by all or some members of the Class. Joinder of all Class members would be either highly impracticable or impossible. And the amounts at stake for individual Class members, while significant in the aggregate, would be insufficient to enable them to retain competent legal counsel to pursue claims individually. In the absence of a class action in this matter, Symmetry will likely retain the benefit of its wrongdoing.

## V.    CLAIMS FOR RELIEF

### A. Count I: Breach of Contract

129.    The allegations set forth above are incorporated herein by reference.

130.    Futamura and the other members of the Class entered into written, fully executed contracts with Symmetry for the firm delivery of natural gas under specific pricing terms.

131.    At all material times, Plaintiff and the Class have performed their terms and obligations under the contracts, including any conditions precedent to performance.

132.    Symmetry materially breached the contracts by its actions and/or inactions in failing to deliver natural gas as nominated by its customers and then charging for that gas.

133.    Symmetry materially breached the contracts by its actions and/or inaction in using prices and Incremental Supply Cost charges not agreed to in the contracts.

134.    As a result of Symmetry's materially breaches, Futamura and the Class have been damaged by being forced to pay for gas that was not delivered, overpay for the gas that was delivered, and being charged improper Incremental Supply Costs.

135.    Because of Symmetry's material breach of the contract, Futamura and the Class are not required to pay the amount stated within the February Invoice.

136.    Accordingly, Futamura and the Class pray that this Court find that Symmetry breached its obligations under the contract, and as a result Futamura and the Class have been damaged in an amount to be proven at trial. Furthermore, Futamura and the Class are not required to pay the February Invoice as a result of Symmetry's prior material breach, and for such other relief in law or equity as the Court deems just and proper.

### B. Count II: Good Faith and Fair Dealing

137.    The allegations set forth above are incorporated herein by reference.

138.    Symmetry's actions amount to more than a simple, material breach of contract. Implied into every contract is the duty to deal honestly and fairly.

139.    Symmetry breached this implied duty and committed a breach of contract resulting in damages to Futamura and the Class by charging Futamura and the Class during a period of declared emergency disaster exorbitant and outrageous amounts that they did not agree to pay.

140.    Symmetry acted to injure the reasonable expectations of Futamura and the Class under the contract, and it impair the rights or interests of Futamura and the Class to receive the benefits flowing from their contractual relationship.

141.    Symmetry made its own calculated business decision to maximize profits while protecting a business relationship and in doing so it destroyed Futamura's and the Class' right to receive the fruits of the contract: firm delivery of gas throughout the month.

142.    As a direct result of Symmetry's breaches, Futamura and the Class have been damaged in an amount yet to be fully determined.

31

143.     Symmetry's breach was performed intentionally, maliciously, and with utter disregard to the express and implied rights of Futamura and the Class. Therefore, in addition to actual damages, Symmetry should pay punitive damages as a method of punishing Symmetry and setting an example for others.

144.     Accordingly, Futamura and the Class pray that this Court find that Symmetry breached its duty of good faith and fair dealing by failing to deliver the gas it purported to deliver and charging Futamura and the Class for the gas it failed to deliver, and in addition, for unconscionably requesting that Futamura and the Class pay exorbitant and outrageous amounts for gas that they never received and in amounts they never agreed to.

### C.     Count III: Unjust Enrichment and Disgorgement

145.     The allegations set forth above are incorporated herein by reference.

146.     Symmetry's payment of amounts owed to Plaintiff and the Class does not provide an adequate legal remedy for the wrongs committed by Symmetry because it will not deprive Symmetry of the ill-gotten gains it has obtained through its unlawful behavior.

147.     The principles of equity and good conscience do not permit Symmetry to retain the benefits derived from its improper and unlawful use of gas nominated by Futamura and the Class as well as payments made for gas that was not delivered.

148.     Futamura and the Class have clean hands and did not engage in any wrongdoing that would excuse Symmetry's obligation to return monies.

149.     Therefore, Futamura and the Class request the Court enter an order directing Symmetry to disgorge itself of any benefits derived from its improper and unlawful use of Plaintiff's and the Class's nominated natural gas and payments.

32

### D.     Count IV and V: Fraud and Deceit

150.    The allegations set forth above are incorporated herein by reference.

151.    Symmetry made uniform misrepresentations, omissions, concealments, and half-truths on its invoices and template messages sent to Futamura and the Class reflecting the wrong volume and price, and not detailing its failure to deliver.

152.    As set forth above, Symmetry made material representations that were false and/or omitted to state one or more material facts needed to make what was stated not misleading. Symmetry knew when the material representation was made on the invoice and on the template letters that the statements were false or misleading and/or at least made recklessly without any knowledge of their truth, or made the statements with the intent that Futamura and the Class would rely on them. Plaintiff and the Class did rely on and/or are legally presumed to have relied upon these uniform written representations as being truthful and accurate, when they were not. Plaintiff and the Class suffered injury and paid unjustified amounts to Symmetry or were denied a credit or payment for their underage as a result.

153.    All records of nominations to suppliers and LDCs, payment formulars, contractual relationships with suppliers and transporters, asset management agreements, and all calculations are firmly kept in the exclusive control of lessees, and they involve undisclosed accounting and operational practices.

154.    Symmetry also concealed or failed to disclose facts about its delivery or nondelivery of nominated gas, its business decisions to divert gas, its inability to procure gas, the price it could have received taking commercially reasonable efforts, and its inability to pass along certain costs and fees, which Symmetry had a duty to disclose to avoid presenting half-truths or misrepresentations.

155.    Symmetry undertook the duty to properly account by making the statements in invoices on a monthly basis and in template messages to customers. By speaking on the issue of delivery, charges, force majeure, and pricing, Symmetry had a duty to make full and fair disclosures of all relevant facts. This is especially so because Symmetry had superior and/or specialized knowledge and/or access to information compared to its customers.

156.    Symmetry knew that its representations or omissions on its invoices and template messages were at least ambiguous and created a false impression of the actual facts to its customers.

157.    Symmetry knew the facts were peculiarly within Symmetry's knowledge and that Futamura and the Class were not in a position to discover the facts pertaining to Symmetry's business decision on gas delivery as well as the propriety of their pricing or assessment of charges. Accordingly, having spoken on the subject matter, Symmetry had a duty to make full and fair disclosure of all material facts such that its statements were not misleading, but did not.

158.    Symmetry was deceitful by suggesting, as a fact, that it had delivered the quantities listed on customers' invoices and that the pricing and charges were correct when those statements were not true. Symmetry knew the statements were not true, had no reasonable grounds for believing they were true, or gave only such information as was likely to mislead for want of the communication of the non-disclosed facts.

159.    Symmetry's representations in the "Force Majeure" notice were false and Symmetry made such representation with actual knowledge of the falsity or with deliberate ignorance as to the truth or falsity of the representations. Symmetry fraudulently covered up the fact that it decided to cut off natural gas deliveries on Southern Star during Winter Storm Uri so

that Symmetry could avoid its "firm" contractual obligations to provide natural gas to its customers regardless of the circumstances.

160.    The misrepresentations and omission were intentionally made. They were intended to suggest that Symmetry had delivered the nominated volumes and any excess amounts to their customers, that the prices listed were the correct daily index price under the contract, that the force majeure was proper, and that all charges were authorized. But in fact, they were not.

161.    By creating and mailing misleading invoices and template letters to Futamura and the Class, Symmetry has fraudulently and deceitfully misled the Class into believing that Futamura and the Class owe Symmetry in excess of what is authorized under their contracts and the actual deliveries.

162.    Symmetry acted intentionally or with reckless disregard of the rights of Futamura and the Class and with malice, on a uniform basis, by not delivering the nominated gas, by deceiving them with invoices that were misleading, and by failing to correct their practices such that punitive damages should be awarded.

163.    As a direct and proximate result of Symmetry's deceit and fraud, Futamura and the Class were charged and paid on misleading invoices and are entitled to recover actual and punitive damages.

164.    Symmetry's concealment of material information induced the false belief by Futamura and the Class that action was not needed.

165.    If it was disclosed that the other party could not or would not deliver, no rational economic actor would enter into a purchase contract for firm delivery. Indeed, the very purpose of a firm delivery contract is to avoid the risk of non-delivery, and certainty of performance is the most material term that must be disclosed when entering into such a contract. Mistakes can happen,

but a party cannot make material misrepresentations, fraudulently conceal information, speak in half-truths, or make material omissions. Once a party speaks, it is bound to speak truthfully and fully, without selectively omitting facts that make its other representations inaccurate.

166.    Two independent reasons confirm that Futamura and every member of the class relied on the invoices and template assurances that Symmetry would deliver gas on time and in the manner promised:

(a)    First, Futamura and the Class made upfront, monthly nominations.

(b)    Second, Futamura and the Class made partial and full payments of the amounts Symmetry invoiced as being "delivered" and priced at the contractual price.

167.    Especially when taken together, these two reasons confirm that Futurama and the Class reasonably relied on Symmetry's misrepresentations, concealment, half-truths, and omissions about its delivery of gas. Had Symmetry fully disclosed externally what it knew internally, Futamura and the Class would not have paid the amounts invoiced and would have protested. Because Symmetry kept the truth secret, however, Futamura and the Class were unaware that fraud was occurring and did not protest.

168.    In addition, the money wrongfully obtained by Symmetry as a result of what should have been paid to Futamura and the Class should be held in constructive trust along with monetary interest for Futamura and the Class.

169.    Accordingly, Futamura and the Class demand judgment against Symmetry for money damages in such amounts as are fair and reasonable, plus judgment for punitive damages in such amounts as are fair and reasonable, plus costs and such further amounts as are fair and reasonable.

### E.    Count VI: Constructive Fraud

170.    The allegations set forth above are incorporated herein by reference.

171.    Symmetry concealed or failed to disclose facts about its delivery or nondelivery of nominated gas, its business decisions to divert gas, its inability to procure gas, the price it could have received taking commercially reasonable efforts, and its inability to pass along certain costs and fees, which Symmetry had a duty to disclose to avoid presenting half-truths or misrepresentations.

172.    Symmetry undertook the duty to properly account by making the statements in invoices on a monthly basis and in template messages to customers. By speaking on the issue of delivery, charges, force majeure, and pricing, Symmetry had a duty to make full and fair disclosures of all relevant facts. This is especially so because Symmetry had superior and/or specialized knowledge and/or access to information compared to its customers.

173.    Symmetry knew that its representations or omissions on its invoices and template messages were at least ambiguous and created a false impression of the actual facts to its customers.

174.    Symmetry knew the facts were peculiarly within Symmetry's knowledge and that Futamura and the Class were not in a position to discover the facts pertaining to Symmetry's business decision on gas delivery as well as the propriety of their pricing or assessment of charges. All records of nominations to suppliers and LDCs, payment formulars, contractual relationships with suppliers and transporters, asset management agreements, and all calculations are firmly kept in the exclusive control of lessees, and they involve undisclosed accounting and operational practices. Accordingly, having spoken on the subject matter, Symmetry had a duty to make full and fair disclosure of all material facts such that its statements were not misleading, but did not.

175.    Plaintiff and the Class did rely on and/or are legally presumed to have relied upon these uniform written representations as being truthful and accurate, when they were not. Plaintiff and the Class suffered injury and paid unjustified amounts to Symmetry or were denied a credit or payment for their underage as a result.

176.    Symmetry's concealment of material information induced the false belief by Futamura and the Class that action was not needed.

177.    If it was disclosed that the other party could not or would not deliver, no rational economic actor would enter into a purchase contract for firm delivery. Indeed, the very purpose of a firm delivery contract is to avoid the risk of non-delivery, and certainty of performance is the most material term that must be disclosed when entering into such a contract. Mistakes can happen, but a party cannot make material misrepresentations, fraudulently conceal information, speak in half-truths, or make material omissions. Once a party speaks, it is bound to speak truthfully and fully, without selectively omitting facts that make its other representations inaccurate.

178.    Two independent reasons confirm that Futamura and every member of the class relied on the invoices and template assurances that Symmetry would deliver gas on time and in the manner promised:

(a)    First, Futamura and the Class made upfront, monthly nominations.

(b)    Second, Futamura and the Class made partial and full payments of the amounts Symmetry invoiced as being "delivered" and priced at the contractual price.

179.    Especially when taken together, these two reasons confirm that Futurama and the Class reasonably relied on Symmetry's misrepresentations, concealment, half-truths, and omissions about its delivery of gas. Had Symmetry fully disclosed externally what it knew internally, Futamura and the Class would not have paid the amounts invoiced and would have

38

protested. Because Symmetry kept the truth secret, however, Futamura and the Class were unaware that fraud was occurring and did not protest.

180.    As a direct and proximate result of Symmetry's constructive fraud, Futamura and the Class were charged and paid on misleading invoices and are entitled to recover actual and punitive damages.

181.    In addition, the money wrongfully obtained by Symmetry as a result of what should have been paid to Futamura and the Class should be held in constructive trust along with monetary interest for Futamura and the Class.

182.    Accordingly, Futamura and the Class demand judgment against Symmetry for money damages in such amounts as are fair and reasonable, plus judgment for punitive damages in such amounts as are fair and reasonable, plus costs and such further amounts as are fair and reasonable.

### F.      Count VII: Declaratory Judgment

183.    The allegations set forth above are incorporated herein by reference.

184.    The controversies between the parties constitutes a present, substantial controversies, the parties have adverse legal interests, and the controversies are susceptible to immediate resolution and are capable of present judicial enforcement.

185.    Symmetry has no adequate remedy at law to determine whether the Contract requires Futamura and the Class to pay the requested unconscionable and unauthorized prices for natural gas.

186.    Accordingly, Futamura and the Class respectfully ask for the following declarations:

(a)     Futamura and the Class are only required to pay prices for gas delivered by Symmetry pursuant to the Contract and any Transaction Confirmation that are conscionable and lawful;

(b)     Futamura and the Class are not required to pay for natural gas that was not delivered to Futamura and the Class by Symmetry.

(c)     Symmetry is obligated to indemnify Futamura and the Class, and hold Futamura and the Class harmless from all claims, including reasonable attorneys' fees and court costs, from all persons arising out of Symmetry's own act or conduct.

(d)     Symmetry's prior material breach of the Contract and Transaction Confirmations relieves Futamura and the Class from having to pay anything additional for the February invoices.

## VI.   JURY DEMAND

187.    Pursuant to Federal Rule of Civil Procedure 38(b), Futamura hereby demands a trial by jury on all claims so triable.

## CONCLUSION AND PRAYER FOR RELIEF

188.    For these reasons, Futamura and the Class seek an order certifying and allowing this case to proceed as a class action with Plaintiff Futamura as class representative for the Class and the undersigned counsel as class counsel. Plaintiff asks for an order awarding Plaintiff Futamura and the Class the following relief against Symmetry:

(a)     Declaratory judgments;

(b)     Court costs;

(c)     Actual damages in an amount to be proven at trial;

(d)     Consequential and incidental damages in an amount to be proven at trial;

(e)     Punitive damages;

(f)     Disgorgement

(g)     Pre- and post-judgment interest;

(h)     Reasonable attorneys' fees as a percentage of the common fund; and

(i)     All other relief, general or special, at law or in equity to which Futamura

and the Class is justly entitled.

DATED:  February 25, 2022                    Respectfully submitted,

/s/ Jo Lynn Jeter
_____
JO LYNN JETER, OBA #20252
NORMAN WOHLGEMUTH, LLP
401 S. Boston Ave. Suite 3200
Tulsa, OK 74103
(918) 583-7571
JJeter@nwlawok.com

REX A. SHARP, OBA #11990
RUTH ANNE FRENCH-HODSON, *pro hac vice*
*forthcoming*
ALLISON WATERS, OBA #21885
SHARP LAW LLP
4820 West 75th Street
Prairie Village, Kansas 66208
(913) 901-0505
rsharp@midwest-law.com
rafrenchhodson@midwest-law.com
awaters@midwest-law.com

Attorneys for Plaintiff Futamura USA, Inc.